680 A.2d 851

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Kevin P. KILLEN, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 19, 1995.

Decided July 31, 1996.

128

Donald Lewis, for Appellant.

John M. Dawson, Douglas W. Ferguson, Meadville, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

CASTILLE, Justice.

The issue on appeal here is whether the trial court erroneously excluded certain provocative statements made by the complainant pursuant to Pennsylvania's Rape Shield Law, 18 Pa.C.S. § 3104. For reasons expressed below, we reverse the Superior Court's order affirming appellant's judgment of sentence and remand this matter for a new trial.[1]

---

1. Because we hold that such statements are not protected by the Rape Shield Law, these alleged statements are specifically addressed herein.

The evidence established that on August 19, 1992, appellant, a uniformed officer with West Mead Township, pulled over the automobile being operated by the complainant in front of her apartment for a speeding violation. The complainant, who appeared intoxicated,[2] related to the appellant that she had been drinking all day and that she did not have her current driver's license in her possession. Accordingly, she requested the officer's permission to enter her apartment to retrieve her driver's license and use the bathroom. Appellant acceded to her requests and followed the complainant inside her apartment.

The complainant testified that after she and appellant entered her apartment, they spoke generally and that he then followed her into one of the children's bedroom where she alleges he pushed her, causing her to fall onto a bed. The complainant testified that she then left the bedroom on her own volition and walked into the living room. The complainant also testified that, although she was too drunk to remember all of the details, she eventually ended up sitting next to appellant on the couch at which time she alleged that he put his hand up her shirt and fondled her breasts. She stated that she did not want appellant to touch her and that she told him several times not to do so.

The complainant further testified that at some point appellant stood in front of her, dropped his trousers and underwear in order for her to perform oral sex. She testified that he also placed his hand on the back of her head to direct her toward his penis. She testified that she continuously turned away from appellant causing him eventually to cease his actions and that, as he started to leave, he told her that he would return the next day. The complainant testified that other than pushing her in the bedroom, appellant never used force in any other way, did not appear angry, did not force her onto the

---

2. The complainant testified that she had been drinking for approximately five hours and that during that time she had consumed numerous beers and approximately eight white russians. She was drinking because she was upset because she and her boyfriend were ending their relationship. Testimony at trial revealed that she had a blood alcohol content of approximately .193 percent.

couch, did not hold her down on the couch and that he did not pin her down on the couch.[3] Nonetheless, shortly after appellant left the apartment, the complainant testified that she went downstairs to use her neighbor's telephone and at that time told her neighbor that appellant had raped her.[4] The neighbor called an ambulance for the complainant and while waiting for its arrival, he observed the complainant apparently lapse in and out of consciousness twice. An ambulance arrived and transported the complainant to Meadville Medical Center where she was treated and released.

During the trial of this matter, in order to attack the complainant's credibility, appellant sought to introduce evidence of certain sexually provocative statements which the complainant allegedly made to a fireman (Larndo Hedrick) who rode with her to the medical center in the ambulance and to the emergency room physician (Dr. Martin).[5] Specifically,

**3.** Although appellant did not testify on his own behalf, an internal affairs investigator testified at trial that appellant told him that the victim had kissed him and that he had responded by rubbing the sides of her legs and touching her breasts.

**4.** The complainant testified that despite her allegation of rape to the neighbor, appellant had in fact not raped her.

**5.** Per defense counsel, all witnesses to the complainant's statements were subpoenaed and ready to testify at trial. (N.T., 5/15/93, p. 150; 5/16/93, 3/16/93, pp. 301–02). Certain of these witnesses' sworn statements are included in the reproduced record. We note with disapproval appellant's inclusion of the alleged witnesses' statements in the reproduced record since they are not part of the original record. Pa. R.A.P. 2152 (reproduced record shall only contain parts of the original record). As a general rule, matters not part of the record will not be considered on appeal. *Commonwealth v. Thomas*, 465 Pa. 442, 350 A.2d 847 (1976). Despite appellant's inclusion of the statements in the reproduced record, the Commonwealth has not objected.

With respect to the original record, it reveals that the trial judge expressly stated that he considered such statements in determining to disallow testimony from the proffered witnesses and that he would allow such statements to be admitted into the record if defense counsel chose to do so. The record further reveals that the offer of proof corroborates the actual substance of the statements; hence, we will overlook this procedural defect for the limited purpose of describing the evidence which the trial court ruled was not admissible under the Rape Shield Law. *See e.g., Christo v. Tuscany, Inc.*, 308 Pa.Super. 564, 454 A.2d 1042, 1043 (1982) (a rule of court which relates only to procedure

appellant sought to introduce the testimony of Hedrick, a black male, that approximately five minutes after the ambulance picked up the complainant, she asked him in a "very forward" and "aggressive tone": "Is it true, you know, what I hear about black men," and that she began laughing afterwards saying she apologized if she embarrassed him. Hedrick would have also testified that the complainant further asked him "Can you tell me why the hair on a white woman's vagina is the same as the hair on a black man's head?" and again started to laugh afterwards. With respect to her demeanor in the ambulance, he would testify that she was very "friendly" towards him, and that she was smiling at him, "looking in his eyes," and pulling her body towards him throughout the ambulance ride. Hedrick would also allegedly have testified that the complainant acted in a flirtatious manner towards the emergency physician at the hospital.[6]

The emergency physician, Dr. Martin, would have allegedly testified that she was jovial during his treatment of her, laughing at times, and that during his examination of her, she commented to him that he was not bad looking for a doctor. He would have further testified that her behavior was generally loud.

Appellant argues that the complainant's statements to Hedrick and Dr. Martin were crucial during trial to impeach the complainant's credibility by demonstrating that her state of mind immediately after the alleged sexual assault was inconsistent with that of a person who had just been criminally sexually assaulted. Appellant asserted as his defense that the complainant was the aggressor, that appellant rejected her advances and that she ultimately fabricated the charges against appellant in retaliation for his departure. Appellant contends that evidence of the complainant's similar overtures

and does not affect substantive rights of the parties is applicable to future procedure in pending litigation).

6.  Appellant also sought to admit the testimony of Paramedic Tad Acker, who rode with the complainant and Hedrick in the ambulance, which allegedly would corroborate Hedrick's account of the complainant's flirtatious behavior.

to Hedrick (approximately five minutes after she admits she falsely told her neighbor appellant had raped her) and to Dr. Martin at the hospital corroborated appellant's theory that the complainant was the aggressor, as opposed to appellant, and that she had fabricated the criminal nature of the incident.

The trial court initially determined that the statements were of a sexual nature and therefore ordered an *in camera* hearing to determine the admissibility of the statements pursuant to the Rape Shield Law.[7] Following the hearing, the trial court concluded that the statements were "suggestive and of a sexual or propositional nature." The trial court concluded, however, that the statements referred to "prior sexual conduct" and, therefore, were inadmissible under the Rape Shield Law. Following a jury trial, appellant was convicted of indecent assault,[8] attempted involuntary deviate sexual intercourse[9] and official oppression.[10] The trial court sentenced appellant to an aggregate term of one and one half (1½) to five (5) years imprisonment. Appellant appealed to the Superior Court which, in an unpublished opinion and order, affirmed the judgment of sentence. We granted allocatur to examine whether the trial court erred by holding that the complainant's statements were inadmissible pursuant to the Pennsylvania Rape Shield Law.

The purpose of the Rape Shield Law is to prevent a sexual assault trial from denigrating into an attack upon the victim's reputation for chastity. *Commonwealth v. Berkowitz*, 537 Pa. 143, 641 A.2d 1161, *reh'g denied* (1994). The Rape Shield Law provides:

### § 3104. Evidence of victim's sexual conduct

(a) **General Rule.**—Evidence of specific instances of the alleged victim's *past sexual conduct,* opinion evidence of the alleged victim's *past sexual conduct,* and reputation evidence of the alleged victim's *past sexual conduct* shall not

7. 18 Pa.C.S. § 3104(a).

8. 18 Pa.C.S. § 3126.

9. 18 Pa.C.S. § 901.

10. 18 Pa.C.S. § 5301.

be admissible in prosecutions under this chapter except evidence of the alleged victim's *past sexual conduct* with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

**(b) Evidentiary proceedings.**—A defendant who proposes to offer evidence of the alleged victim's *past sexual conduct* pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards as set forth in subsection (a).

18 Pa.C.S. § 3104 (emphasis added).

■ The proffered testimony in the case *sub judice* does not reference in any way the complainant's *past* sexual conduct as proscribed by § 3104(a); rather, the statements evidence the complainant's state of mind shortly *after* (and by implication during) her alleged sexual assault and are therefore relevant and admissible to impeach her credibility. The Rape Shield Law was not designed to exclude evidence of a victim's statements to persons which are part of and relevant to the ongoing episode in which the alleged criminal activity takes place. The fact that the statements are sexually provocative in content does not automatically bring them within the protective purview of the Rape Shield Law.

Moreover, appellant did not seek admission of the complainant's provocative statements to demonstrate that complainant acted promiscuously in her past or that her reputation was such; rather, appellant sought to introduce the proffered line of evidence for the limited purpose of impeaching the complainant's credibility by demonstrating her state of mind immediately after the alleged attack.[11] Appellant argued that the complainant's statements made after the alleged assault

**11.** *See e.g., Commonwealth v. Lowenberg,* 481 Pa. 244, 392 A.2d 1274 (1978) (a victim's out-of-court statement demonstrating victim's state of mind are admissible).

were relevant to the defense theory of her fabrication of the events supporting the criminal charges against appellant since her conduct and state of mind could be fairly construed by the jury as being inconsistent with that of a person recently criminally assaulted. Clearly, the credibility of both the complainant and appellant was a critical issue in the instant case in which there were no other witnesses to the event.[12] By prohibiting appellant from introducing the relevant evidence at issue, the trial court severely restricted appellant's ability to present an adequate defense to the crimes charged against him. Under these circumstances, such error was not harmless. *Commonwealth v. Story*, 476 Pa. 391, 405–09, 383 A.2d 155, 161–64 (1978) (an error can be harmless only if the this Court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict).

Accordingly, the statements at issue in the instant case were not subject to the Rape Shield Law and were admissible in order to assist the jury in assessing the complainant's credibility in determining whether the complainant was a victim of sexual assault. The order of the Superior Court is, therefore, reversed and this matter is remanded to the trial court for a new trial.

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

ZAPPALA, J., dissents.

---

**12.** The complainant's boyfriend testified that he arrived at the apartment once while appellant was present and that appellant greeted him at the door. The witness further testified that he could see the complainant standing between the living room and the kitchen and that she was extremely drunk. However, the boyfriend left the apartment and could not testify to what occurred during the period when he was not present.